**STATE of Missouri, Respondent,**

v.

**Robert G. ERRINGTON, Appellant.**

No. 48352.

Supreme Court of Missouri,

En Banc.

March 12, 1962.

James L. McMullin, Kansas City, for appellant.

John M. Dalton, Atty. Gen., Julian L. O'Malley, Asst. Atty. Gen., Jefferson City, for respondent.

STOCKARD, Commissioner.

Robert G. Errington, whose "right name" according to testimony he gave in support of a preliminary motion is "Herman Heinrich Gotthold Helmers," was found guilty (in a jury waived case) of practicing medicine without a license in violation of § 334.030 RSMo 1949, V.A.M.S. (now repealed), a misdemeanor, and he was sentenced to confinement in the county jail for one year and a fine of $1,000. He has appealed from the ensuing judgment and

asserts among other things that the above statute is unconstitutional. Jurisdiction of the appeal is in this court.

The substitute information on which appellant was tried charged that "on the 29th day of May, 1959, * * * [he] did then and there unlawfully and wilfully attempt to treat one Ethel Wales Strunk, who at that time was sick, and that the said Robert G. Errington practiced medicine without being duly licensed by the Missouri State Board of Medical Examiners, * * *." § 334.030, upon which the information was based, was repealed effective August 29, 1959, and the substance thereof was re-enacted as §§ 334.010 and 334.250 RSMo 1959, V.A.M.S. cumulative supplement. The substitute information was filed October 16, 1959. The institution of the action subsequent to the repeal of the statute for a violation alleged to have occurred before its repeal is specifically authorized by § 1.160 RSMo 1959, V.A.M.S. Reference hereafter to statutes, unless otherwise stated, will be to them as they existed at the time of the alleged offense although a substantial change was made to Chapter 334 effective August 29, 1959.

Appellant maintained an office at 100 East 63rd Street, Kansas City, Missouri. He was listed in the "yellow pages" of the Kansas City telephone directory as follows: "Conservatory of Health, Dr. Robert G. Errington, Naturopathic Physician, Jackson 3–9201." On May 26, 1959, Ethel Wales Strunk called in person at appellant's office because, as she said, her condition was "run down." After appellant talked to her he told her that "it sounded like" she was "anemic and run down," that there was "probably something else wrong, perhaps gallstones," that he had a series of 18 treatments which "would get rid of them" and that the cost would be "$178.00 plus vitamins." Miss Strunk gave appellant a check for "the down payment" in the amount of $50 and was told to return on the following Friday morning, May 29, to receive a "dose of medicine." At that time appellant and his wife, referred to as his nurse, gave Miss Strunk "a glass full of medicine" which was "sort of pinkish-white." Miss Strunk testified that appellant said it was "a mild laxative" to "clean me out before they gave me the other dose of medicine." That evening, after she arrived home, she was "sort of sick" at her stomach and she felt as though she had taken "quite a laxative." By pre-arrangement appellant's nurse went home with Miss Strunk, and the nurse gave her "a glass of sort of yellowish, oily substance to drink." About midnight she became "real sick" and vomited a "greenish substance." She was too sick to go to work on the following Monday and Tuesday. On June 2, 1959, she returned to appellant's office. She was placed on a "sort of vibration table," was given "hot and cold baths in a big tub," and was placed in front of a series of sun lamps. Appellant then came in and gave her an "adjustment." He "popped [her] neck and back," which was "supposed to help * * * circulation." Miss Strunk testified that at this time appellant "assumed" that she had gotten rid of the gallstones by reason of the previous treatment.

Miss Strunk asked appellant if he "studied to get his degree like most other licensed physicians do," and he replied that he did and that he was a licensed doctor. She and appellant then discussed "vitamins [she] would have to have." Appellant gave her "calcium powder" out of a gallon can for which she paid him $10.50. On June 9 she returned to appellant's office and "went through the series of treatments of the hot and cold baths and the adjustment again." At this time appellant gave her four bottles of vitamins, "it was A, C, D and E," which he said would "help build [her] up," but at the time her condition "had gotten worse." For these vitamins Miss Strunk paid appellant $44.60.

On June 16 and again on June 23 Miss Strunk received another "series of treatments." On June 16 appellant gave her another bottle of vitamins, "B-Complex, he called them" for which she paid $12.20.

By this time Miss Strunk "was wondering about him" and also about the price of the vitamins. He "mentioned he had to have a special license to administer vitamins in less than 100, because the bottles were sealed," but the bottle he had given Miss Strunk had not been sealed. She discussed this with him but he "really didn't have an explanation for the fact the bottles weren't sealed."

Miss Strunk received no further treatments from appellant, but she returned on July 1, 1959 to have him fill out an insurance form. Appellant filled in the answers on a "physician's Statement." In answer to the question "Your diagnosis," he wrote in the word "Choledochitis." He also made check marks to show that her condition was due to illness and not an accident and that the illness was a "primary condition." He wrote the word "Indigestion" in answer to the question, "What other disease is it secondary to, complicated with, or a sequence of." In answer to the question, "Dates you treated patient for this condition" he wrote "May 26" for treatment "at office," and he wrote "May 27–28–29–30 June 1–2–3–16, 23–30" for treatments "At home." He made a check mark indicating that the "patient [had no] chronic or constitutional disease, physical defect or deformity." The form had a place for signature as follows: "Signed ———— M.D." Here appellant wrote "Dr. Robert G. Errington," and without marking out the printed letters "M.D." he wrote over them what appears to be "N.D."

There is no contention that appellant was or has been licensed by this State to engage in the practice of medicine or any of the healing arts, and it affirmatively appears that he was not licensed by the board of medical examiners referred to in § 334.020. In the latter part of 1958 appellant was enjoined by this court from the practice of medicine on the basis that he was not licensed by this State to practice medicine and that such unlicensed practice constituted a continuing public nuisance detrimental to the public health and contrary to and against the public policy of this State. See State v. Errington, Mo.Sup., 317 S.W. 2d 326, certiorari denied 359 U.S. 992, 79 S.Ct. 1122, 3 L.Ed.2d 980.

Appellant asserts that § 334.030 does not define the term "practice of medicine" and for this reason does not proscribe any activity as a crime.

"'It is, of course, true that the defendant in a criminal cause has a constitutional right to demand the nature and cause of the accusation against him, and a criminal statute must be sufficiently clear that there can be no doubt as to when such statute is being violated.'" State v. King, Mo.Sup., 303 S.W.2d 930, 935. In Jordan v. De George, 341 U.S. 223, 71 S.Ct. 703, 707, 95 L.Ed. 886, it was stated that "The essential purpose of the 'void for vagueness' doctrine is to warn individuals of the criminal consequences of their conduct." In that case it was further ruled that "difficulty in determining whether certain marginal offenses are within the meaning of the language under attack as vague does not automatically render a statute unconstitutional for indefiniteness. United States v. Wurzbach, 1930, 280 U.S. 396, 399, 50 S.Ct. 167, 168, 74 L.Ed. 508. Impossible standards of specificity are not required. United States v. Petrillo, 1947, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877. The test is whether the language conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices." See also Berger v. United States, 8 Cir., 200 F.2d 818. The certainty required may be accomplished by the use of words or terms of common understanding and settled meaning. 22 C.J.S. Criminal Law § 24, p. 73; 14 Am.Jur. Criminal Law § 19; Star Square Auto Supply Co. v. Gerk, 325 Mo. 968, 30 S.W.2d 447; People v. Ring, 26 Cal.App.2d Supp. 768, 70 P.2d 281 (statute made it a misdemeanor for one not a member of the bar to "practice law"); Goldstine v. State, 234 Ind. 388, 126 N.E.2d 581; State v.

Bobbins, 35 N.J.Super. 494, 114 A.2d 474; Annotation 96 L.Ed. 374, 378. Conduct proscribed by § 334.030 included the "practice of medicine," a term of common understanding and meaning and universally accepted to include, although not necessarily limited to, the acts of one publicly representing himself to be trained in the treatment and cure of ills of the human body and purporting for a fee to diagnose bodily ills and effectuate a cure or an alleviation thereof. See State v. Smith, 233 Mo. 242, 135 S.W. 465, 33 L.R.A.,N.S., 179; State v. Davis, 194 Mo. 485, 92 S.W. 484, 4 L.R.A., N.S., 1023; State ex rel. Collett v. Errington, supra; State ex rel. Collett v. Scopel, Mo.Sup., 316 S.W.2d 515; 41 Am.Jur., Physicians and Surgeons § 24; 70 C.J.S. Physicians and Surgeons § 10. The information fully advised appellant of the acts contended by the State to constitute the practice of medicine. The evidence established that the conduct of appellant did constitute the practice of medicine in the generally accepted and understood meaning of that term which § 334.030 proscribed and declared to constitute a misdemeanor unless done by one duly licensed as provided by law or excused from obtaining a license. We find no merit to appellant's contention that § 334.030 was invalid for the reason that the term "practice of medicine" was not given a legislative definition.

 Appellant next contends that what he did in the treatment of Miss Strunk consisted only of "acts the Legislature of Missouri has by statute permitted osteopaths to prescribe and perform and has specifically declared the same to be not the 'practice of medicine.' " Prior to August 29, 1959, § 337.010 RSMo 1949, V.A.M.S., provided that "The system, method or science of treating diseases of the human body, commonly known as osteopathy, * * * is hereby declared not to be the practice of medicine and surgery within the meaning of sections 334.010 to 334.180 and not subject to the provisions of said chapter." In Atkinson v. American School of Osteopathy, 240 Mo. 338, 144 S.W. 816, 821, this court said: "It is true that section 8537 [RSMo 1899] provides that osteopathy is 'not to be the practice of medicine and surgery within the meaning of article 1 of this chapter [entitled Medicine and Surgery], and not subject to the provisions of said article'; but the purpose so expressed is simply to segregate this particular system from those for the regulation of which article 1 was enacted." In Stribling v. Jolley, 241 Mo.App. 1123, 253 S.W.2d 519, it was held that osteopathic physicians were practitioners of a school of medicine within the meaning of § 205.300 RSMo 1959, V.A.M.S., which provides that in the management of a county hospital by the trustees thereof "no discrimination shall be made against practitioners of any school of medicine recognized by the laws of Missouri." It thus appears that osteopathic physicians do in fact practice medicine, but prior to August 29, 1959, this state segregated the particular system known as osteopathy and provided certain regulations in Chapter 337 applicable alone to that system, and it also provided that the authorized practice of osteopathy did not constitute the practice of medicine for the purpose of regulation pursuant to the provisions of Chapter 334. This, of course, did not mean that acts constituting the practice of medicine and authorized by Chapter 337 to be performed by a licensed osteopathic physician did not constitute the practice of medicine when performed by an unlicensed person. It meant only that one licensed as an osteopathic physician could perform those acts without being in violation of Chapter 334. There is no contention that appellant was or ever has been licensed by this State to practice osteopathy or any other branch of the healing arts. Therefore, the commission by him of acts constituting the practice of medicine constituted a violation of § 334.030.

Appellant next contends that he is a naturopath; that the practice of naturopathy is a "recognized occupation" which is not prohibited or expressly regulated by this State; and that to require appellant

to be a licensed physician in order to practice naturopathy denies him the right to follow such occupation in violation of the Fourteenth Amendment to the Constitution of the United States.

 In the frequently cited case of Dent v. State of West Virginia, 129 U.S. 114, 9 S.Ct. 231, 233, 32 L.Ed. 623, it was stated that "It is undoubtedly the right of every citizen of the United States to follow any lawful calling, business, or profession he may choose, subject only to such restrictions as are imposed upon all persons of like age, sex, and condition." That case involved the validity of a statute which required every person practicing medicine to obtain a certificate or license from the state board of health. The United States Supreme Court went on to say that although the interest of one to continue a profession is often of great value and cannot arbitrarily be taken from him, "there is no arbitrary deprivation of such right where its exercise is not permitted because of a failure to comply with conditions imposed by the state for the protection of society. The power of the state to provide for the general welfare of its people authorizes it to prescribe all such regulations as in its judgment will secure or tend to secure them against the consequences of ignorance and incapacity, as well as of deception and fraud. As one means to this end it has been the practice of different states, from time immemorial, to exact in many pursuits a certain degree of skill and learning upon which the community may confidently rely; * * *. The nature and extent of the qualifications required must depend primarily upon the judgment of the state as to their necessity. If they are appropriate to the calling or profession, and attainable by reasonable study or application, no objection to their validity can be raised because of their stringency or difficulty. It is only when they have no relation to such calling or profession, or are unattainable by such reasonable study and application, that they can operate to deprive one of his right to pursue a lawful vocation." See

also Williams v. State of Arkansas, 217 U.S. 79, 30 S.Ct. 493, 54 L.Ed. 673; Watson v. State of Maryland, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987; Hawker v. People of State of New York, 170 U.S. 189, 18 S.Ct. 573, 42 L.Ed. 1002; Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. In the exercise of its right and authority to regulate for the public safety and welfare the Legislature of this State determined it to be proper and in the public interest to require all persons desiring to practice medicine to obtain a license therefor after complying with certain requirements, and by § 334.030 it was made a misdemeanor for anyone to practice medicine without such license if not exempt from this requirement by reason of another statute. The Legislature has recognized and made provision for persons desiring to practice medicine in certain limited fields or to engage in related professions such as chiropodists (Chapter 330), chiropractors (Chapter 331), dentists (Chapter 332), nurses (Chapter 335), optometrists (Chapter 336), osteopaths (Chapter 337, now repealed), and pharmacists (Chapter 338). The Legislature has not deemed it appropriate or in the public interest to make special provision for the regulation and licensing of persons to engage in the practice of naturopathy. However, a state is not necessarily required to recognize or make special provision for every special field or system of healing or therapy and provide for the licensing of the followers of each such school by requiring of them only such education or knowledge as that particular group of followers may think appropriate. Louisiana State Board of Medical Examiners v. Fife, 162 La. 681, 111 So. 58, 54 A.L.R. 594, affirmed 274 U.S. 720, 47 S.Ct. 590, 71 L.Ed. 1324; Hitchcock v. Collenberg, D.C., 140 F.Supp. 894, affirmed 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718; Schlicting v. Texas State Board of Medical Examiners, Tex., 310 S.W.2d 557; Hahn v. State, 78 Wyo. 258, 322 P.2d 896; State ex rel. Collett v. Scopel, Mo.Sup., 316 S.W.2d 515, 519. As pointed out in the Scopel case, this State

does not prohibit the practice of naturopathy, but it has established certain requirements which must be met and satisfied by any person (not exempted by some statute) who undertakes the practice of medicine, and one so licensed to practice may, if he desires, apply the tenets and principles of naturopathy in his practice. While a State cannot arbitrarily confine all healing to any one school or practice, State v. Biggs, 133 N.C. 729, 46 S.E. 401, 64 L.R.A. 139, distinctions may be made and schools and methods exempted from regulation or made subject to special regulation, so long as the distinctions are not arbitrary or unreasonable. Watson v. State of Maryland, 218 U.S. 173, 30 S.Ct. 644, 54 L.Ed. 987; Semler v. Oregon State Board of Dental Examiners, supra; Parks v. State, 159 Ind. 211, 64 N.E. 862; Hitchcock v. Collenberg, supra.

Appellant offered no evidence (except reading into the record the provisions of certain Missouri statutes of which we take judicial notice), and therefore the record does not tend to reveal any basis whatever for ruling or even implying that the failure of this State to make special provision for practitioners of naturopathy is arbitrary or unreasonable. It is not even established that appellant is a naturopath (except that he advertised as such in a telephone directory) or that he is qualified to practice naturopathy. In fact, there is nothing in the record to indicate of what the practice of naturopathy consists; that is, whether its principles are limited to some particular method of practicing the art of healing or to some limited portion of the human body, or whether it is kindred to the principles and scope of treatment employed by an allopathic or homeopathic physician. Appellant quotes in his brief a dictionary definition of naturopathy as "A drugless system of therapy by use of forces such as air, light, water, heat, massage, etc." Assuming this to be a reasonably accurate definition of the principles of naturopathy, the evidence clearly establishes that appellant did not limit his activity to drugless therapy; he administered drugs.

All the constitutional objections made by appellant were presented in Hitchcock v. Collenberg, supra, thoroughly discussed in that case, and correctly ruled adversely to appellant's contentions. That case was later affirmed without opinion by the United States Supreme Court, 353 U.S. 919, 77 S.Ct. 679, 1 L.Ed.2d 718.

 The statute under which appellant was charged, § 334.030, provides that violation thereof is a misdemeanor, but no punishment is prescribed. As previously noted, this statute was repealed before the judgment in this case was entered, but the offense of practicing medicine without a license was reenacted as §§ 334.010 and 334.025, RSMo 1959, V.A.M.S. § 1.160 provides that when a statutory provision creating an offense is repealed or amended "the trial and punishment" for such offense shall be had, in all respects, as if the provision had not been repealed or amended "except * * * that if the penalty or punishment for any offense be reduced or lessened by any alteration of the law creating the offense, such penalty or punishment shall be assessed according to the amendatory law." § 334.010, as reenacted effective August 29, 1959, provides that it shall be unlawful for any person not a registered physician within the meaning of the law "to practice medicine," and § 334.250, as reenacted, provides that any person "who violates section 334.010 shall, upon conviction, be adjudged guilty of a misdemeanor for each and every offense," but no punishment is prescribed. Therefore, the "penalty or punishment" for the offense of practicing medicine without license was not "reduced or lessened by any alteration of the law creating the offense." § 556.270 provides that when an offense is declared by statute to be a misdemeanor, "and no punishment is prescribed by that or any other statute" the punishment may be imprisonment in a county jail not exceeding

one year or a fine not exceeding one thousand dollars, or both. Apparently the punishment was administered pursuant to this statute. The Attorney General does not take the position that § 556.270 does not prescribe the punishment, but he states that he feels "duty-bound" to invite the attention of the court to § 564.320, which is as follows: "If any person shall carry on or transact any business or occupation without license therefor, when such license is required by any law of this state, he shall be deemed guilty of a misdemeanor, and when no other punishment is prescribed for such offense, be fined in any sum not exceeding one hundred dollars or be imprisoned in the county jail not exceeding three months, or both." This section creates an offense constituting a misdemeanor and prescribes the punishment therefor. It is general in its application and is broader than § 334.030 (before its repeal) and broader in its application than §§ 334.010 and 334.250 as reenacted. It creates a separate and distinct offense from that created by § 334.030 (before its repeal) or by §§ 334.010 and 334.250 (as reenacted) which are specific and limited in their application. § 564.320 does not purport to prescribe the punishment for the offenses created by § 334.030 (before its repeal) and it does not constitute the "other statute" referred to in § 556.270. The punishment for the violation of the offense charged is prescribed by § 556.270, and the punishment which was imposed, while constituting the maximum authorized, is within the limits therein set out.

We have examined the record and find no error in regard to the matters referred to in Supreme Court Rule 28.02, V.A.M.R., not required to be preserved by an assignment of error upon an appeal. The judgment is affirmed and the sentence pronounced shall be executed.

PER CURIAM.

The foregoing opinion by STOCKARD, C., is adopted as the opinion of the Court en banc.

All concur.