Richard J. PARMLEY, Appellant,

v.

MISSOURI DENTAL BOARD, et al., Respondents.

No. 67690.

Supreme Court of Missouri, En Banc.

Nov. 18, 1986.

Mark H. Kruger, St. Louis, for appellant.

Richard L. Schnake, Jean Paul Bradshaw, II, Springfield, for respondents.

DONNELLY, Judge.

Appellant Parmley filed a Complaint with the Administrative Hearing Commission seeking an order that would declare that he had satisfied the requirements for certification as a pedodontist without examination pursuant to § 332.171.1, RSMo Cum.Supp. 1984, and direct the Missouri Dental Board to issue him a specialty license. The license would enable him to advertise his specialty consistent with the provisions of § 332.321, RSMo Cum.Supp.1984. The Complaint was dismissed and plaintiff then sought judicial review of the Administrative Hearing Commission's actions, and a declaratory judgment that the licensing statutes were unconstitutional. The Circuit Court of St. Louis County denied both counts for relief and dismissed the action. The cause was transferred to this Court to resolve issues involving the constitutionality of Missouri statutes. Mo. Const. art. V, § 3. We affirm.

The basic facts are undisputed. Appellant graduated in June 1960 from the St. Louis University School of Dentistry and was subsequently licensed as a dentist in this State. He then began to limit his practice exclusively to pedodontics. Pedodontics is a branch or specialized area of dentistry concerned with the dental care of children.

Within the structure of the American Dental Association (ADA), there are eight specialties,[1] one of which is pedodontics. Each of those specialties that are recognized by the ADA has its own certification body, known as an "American board." For example, the certifying body in this case would be the American Board of Pedodontics. To be a member or what is termed a "diplomate" of the board, an applicant must have completed two years of graduate training in pedodontics and passed an examination. In addition, each of the American boards must have a parent or sponsoring organization in order to be recognized by the ADA.

In 1960, the parent or sponsoring organization for the American Board of Pedodontics was the American Society of Dentistry for Children. The sponsorship was transferred to the American Academy of Pedodontics in 1963 because membership in the Academy more accurately reflected a true specialty organization. Apparently, any interested person could become a member of the Society, while the Academy required a member to be a specialist in that area.

At the time appellant began to limit his practice, he could *ethically* announce limitation of his practice only under certain conditions. Section 18 of the ADA *Principles of Ethics* stated that:

3. The dentist must be a diplomate of a certifying board approved by the American Dental Association for the indicated area of dentistry; or he must be a member of, or be eligible for membership in, a specialty society officially related to a certifying board approved by the American Dental Association for the indicated area of dentistry; or he must have a

---

1. The eight specialties are: dental public health; endodontics; oral pathology; orthodontics; oral and maxillofacial surgery; pedodontics; periodontics; and prosthodontics.

state license in the indicated area of dentistry if he practices within a state which licenses dentists who engage in specialty practice.

In 1964, the ADA Council on Dental Education revised its rules to provide that after January 1, 1965, a dentist must complete two years of graduate education before he could *ethically* announce his limitation of practice. A grandfather clause allowed such an announcement by those dentists who were eligible for membership in the Academy and had limited their practice before January 1, 1965. Appellant then became a member of the American Academy of Pedodontics in October 1964 and was promoted to an active member of that organization in 1969. Thereby, under the ADA *Principles of Ethics*, appellant could *ethically* announce his limitation of practice.

On December 20, 1967, the appellant was notified by the ADA that he no longer would be listed as a pedodontist in the *American Dental Directory* because he had not obtained a Missouri specialty license. Nearly thirteen years later, appellant applied for but was denied a specialty license by the Missouri Dental Board because he did not meet the statutory requirements.

Appellant first contends that there was insufficient evidence to support the dismissal of his cause of action by the Administrative Hearing Commission and the Circuit Court of the City of St. Louis in that he has satisfied the requirements of § 332.171.1 for licensure and certification without examination as a specialist in pedodontics. We disagree.

Section 332.171.1 states:

1. The board shall upon application and without examination issue a specialist's certificate to any registered and currently licensed dentist in Missouri who has been certified in any specialty by an American board recognized by the American Dental Association; but any such application shall be accompanied by the required specialty fee.

The central issue then is whether the phrase, "American board recognized by the American Dental Association," may be interpreted broadly enough to encompass appellant's membership in the Academy. The primary rule of statutory construction is to ascertain the true intent of the legislature and to construe the statute accordingly. *Collins v. Director of Revenue*, 691 S.W.2d 246, 251 (Mo. banc 1985); *King v. Laclede Gas Co.*, 648 S.W.2d 113, 115 (Mo. banc 1983). In doing so, the words or phrases should be considered in the light of their plain and ordinary meaning. *State ex rel. D.M. v. Hoester*, 681 S.W.2d 449, 450 (Mo. banc 1984).

The evidence below shows that the ADA recognizes only the American Board of Pedodontics as having certification power and not the Academy. The ADA has no direct control over the Academy whose sole function is to further that particular field of specialization. In fact, the Academy itself concedes that the only body with certification power is the American Board of Pedodontics and that membership in the Academy does not constitute certification as a specialist in the field of pedodontics.

Appellant's argument that his membership in the American Academy of Pedodontics is sufficient to satisfy the statutory requirements for licensure is misplaced, and if adopted would reject the plain meaning of the statute as evidenced by the above facts. Therefore, we do not construe § 332.171 as broadly as appellant would like. The American boards recognized by the ADA in each area of specialization are the only organizations that satisfy the unambiguous language of the statute.[2]

---

**2.** Respondent, citing *Becker v. St. Francois County*, 421 S.W.2d 779, 784 (Mo.1967), contends that the above interpretation is also supported by the Missouri Dental Board's identical interpretation and that this "must have been known to the legislature when it reenacted the same language time after time," since its original adoption in § 332.060.1, RSMo 1959. However, this Court has recently refused to extend the reenactment theory applicable to judicial construction to administrative rulings. *Blue Springs Bowl v. Spradling*, 551 S.W.2d 596, 600–

The clear intention of the legislature was to limit specialty licensure and certification to those dentists who have successfully completed an examination approved and administered either by the Missouri Dental Board or the ADA through its recognized American boards. A contrary interpretation by this Court would thwart this intent and allow simple membership in a specialty organization and a limited practice to circumvent the requirements imposed by the legislature to protect the citizenry of this State.

Appellant failed to show that he is a "diplomate" of the American Board of Pedodontics, so as to require the Missouri Dental Board to issue him a license. The judgment below to dismiss appellant's Complaint is supported by substantial evidence. Murphy v. Carron, 536 S.W.2d 30, 32 (Mo. banc 1976).

Appellant Parmley next maintains his First Amendment rights have been curtailed impermissibly by Missouri statute, in that: 1) he is not permitted to advertise a "specialty" in pedodontics;[3] and 2) he must accompany any announcement that his practice is "limited to" pedodontics with a disclaimer notifying readers he is not licensed or otherwise recognized as a pedodontist by this State.[4] After a general discussion of commercial speech doctrine, his assertions are addressed sequentially.[5]

First Amendment protection for commercial speech stems primarily from the "information function of advertising," *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 563, 100 S.Ct. 2343, 2350, 65 L.Ed.2d 341 (1980); the goal of "efficient allocation of resources" and the underlying need for "informed consumer choice," *Friedman v. Rogers*, 440 U.S. 1, 8–9, 99 S.Ct. 887, 893, 59 L.Ed.2d 100 (1979); and the very nature of the free enterprise system. *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976). Commercial speech, therefore, implicates the interests of society, the speaker, and the consumer or audience.

Society's interest in the "free flow of information," *Virginia Pharmacy*, 425 U.S. at 763, 96 S.Ct. at 1826, is tied to the economic free market concept:

So long as we preserve a predominantly free enterprise economy, the allocation

---

01 (Mo. banc 1977); *Bartlett and Co. Grain v. Director of Revenue*, 649 S.W.2d 220, 224 (Mo. banc 1983). In addition, since we have held that there is no ambiguity, we may not rely on such extrinsic aids to construction. *In re Bernay's Estate*, 344 Mo. 135, 126 S.W.2d 209, 217 (1939); *State ex rel. Bell v. Phillips Petroleum Co.*, 349 Mo. 360, 160 S.W.2d 764, 769 (1942); *Metropolitan Life Ins. Co. v. Scheufler*, 180 S.W.2d 742, 745 (1944); *Orr v. Hoehn*, 353 Mo. 426, 182 S.W.2d 596, 600 (1944); *State ex rel. Springfield Warehouse and Transfer Co. v. Public Service Commission*, 240 Mo.App. 1147, 225 S.W.2d 792, 794 (1949); *State v. Atterbury*, 364 Mo. 963, 270 S.W.2d 399, 404 (banc 1954).

3. Section 332.321.2(14)(e), RSMo Supp.1986, provides:

"Any announcement in any form including the term 'specialist' or the phrase 'limited to the specialty of' *unless* each person named in conjunction with the term or phrase, or responsible for the announcement, holds a valid Missouri certificate and license evidencing that he is a specialist in that area [is considered false, misleading or deceptive advertising]; ...."

*Id.* (emphasis added).

4. Section 332.321.2(14)(f), RSMo Supp.1986, requires that an announcement containing "any of the terms denoting recognized specialties, or other descriptive terms carrying the same meaning" also include the following: "Notice: the following dentist(s) in this practice is (are) not licensed in Missouri as specialists in the advertised dental specialty(s) of...." *Id.*

5. Parmley also takes issue with C.S.R. 110–2.-110(3)(B) (1984):

"(3) A duly registered and currently licensed dentist may—

"(B) Limit his practice exclusively to one (1) of the special areas approved by the board, and if the dentist has a current license issued by the board entitling him to engage in a specialty practice, he may include a statement of such specialty in advertisements by using one (1) of the following words or phrase: 'Specialists,' 'Practice Limited to,' 'Limited to the Specialty of,' or 'Specializing in.'"

*Id.* The inconsistent obligations imposed by the statute and regulation are addressed *infra*; appellant's First Amendment claim is reviewed in light of the statutory provisions only due to the holding reached with regard to the regulation.

of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well-informed. To this end, the free flow of commercial speech is indispensable.

*Id.* at 765, 96 S.Ct. at 1827. This interest is in no way diminished by the perceived value of the speech involved, however "tasteless and excessive," if otherwise content-protected. *Id.; compare Miller v. California*, 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (obscene publications unprotected by first amendment). Despite the "purely commercial nature" of speech, this may not divest it of all public interest. *Virginia Pharmacy*, 425 U.S. at 764, 96 S.Ct. at 1827.

Related to this societal interest is that of the communicator, likewise economic. His survival, and that of the system itself, depend on promotion of his product or service in an appealing and accurate manner. *Id.* at 762–63, 96 S.Ct. at 1825–26; *see also, e.g., Friedman v. Rogers*, 440 U.S. at 10, 99 S.Ct. at 894.

Third and perhaps most important are the interests of the consumer, who is faced with the economic choices regarding how best to apply his or her resources. The choice may not be one of luxury, or even convenience, due to the nature of the product or services sought or the patron's economic circumstances; hence the need for complete and accurate information may be great. *Virginia Pharmacy*, 425 U.S. at 763–64, 96 S.Ct. at 1826–27.

These concerns have produced a standard which offers commercial speech "qualified but nonetheless substantial protection." *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 68, 103 S.Ct. 2875, 2881, 77 L.Ed.2d 469 (1983). Although "[t]he relationship of speech to the marketplace of product or of services does not make it valueless to the marketplace of ideas," *Bigelow v. Virginia*, 421 U.S. 809, 826, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975), that relationship does diminish First Amend-

ment protection. As explained in *Virginia Pharmacy:*

There are commonsense differences between speech that does no more than propose a commercial transaction and other varieties.... The truth of commercial speech, for example, may be more easily verifiable by its disseminator than ... news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else. Also, commercial speech may be more durable than other kinds. Since advertising is the *sine qua non* of commercial profits, there is little likelihood of its being chilled by proper regulation and foregone entirely.

*Id.* at 771, n. 24, 96 S.Ct. at 1830 n. 24; *see also Friedman v. Rogers*, 440 U.S. at 10, 99 S.Ct. at 894. The Court also has expressed concern with maintaining the integrity of other first amendment protections:

To require a parity of constitutional protection for commercial and noncommercial speech alike could invite dilution, simply by a leveling process, of the force of the Amendment's guarantee with respect to the latter kind of speech.

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456, 98 S.Ct. 1912, 1918, 56 L.Ed.2d 444 (1978). It is against the backdrop of these general notions that rules of analysis and applicability have developed.

In a case raising commercial speech questions, as in any First Amendment setting, the Court must weigh the "public and private interests that the first amendment protects against the justifications proffered by the State" supporting regulation. *Friedman v. Rogers*, 440 U.S. 1, 20, 99 S.Ct. 887, 899, 59 L.Ed.2d 100 (1979) (Blackmun, J., dissenting) (citing in general *Virginia Pharmacy*, 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976); *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. 85, 97 S.Ct. 1614, 52 L.Ed.2d 155 (1977)). For the *Virginia Pharmacy* Court, this principle provided obvious examples of proper regu-

lation, drawn from noncommercial areas: a) appropriate time, place and manner restrictions; b) prohibition of untrue statements; and c) forbidding speech which proposed illegal transactions. *Id.* at 771–72, 96 S.Ct. at 1830–31. Additionally, the *Virginia Pharmacy* Court suggested the lesser protection offered might accommodate otherwise suspect prior restraints without constitutional difficulty. *Id.* at 771, n. 24, 96 S.Ct. at 1830 n. 24. Most important here, the Court expanded the traditional lack of solicitude for untruth to include deception and misrepresentation, writing that "much commercial speech is not provably [or even completely] false." *Id.* at 771, 96 S.Ct. at 1830. Thus, "[i]n light of the greater potential for deception or confusion in the context of certain advertising messages, . . . content-based restrictions on commercial speech may be permissible." *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. at 65, 103 S.Ct. at 2879.

Three observations may be drawn from Supreme Court decisions since *Virginia Pharmacy:* 1) the Court has not strayed far, in terms of subject matter reviewed, from the regulatory examples set out in that case. *See, e.g., Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985) (regulating asserted deception in lawyer advertising); *Metromedia, Inc. v. City of San Diego,* 453 U.S. 490, 101 S.Ct. 2882, 69 L.Ed.2d 800 (1981) (time, place and manner regulation of billboards). Many address regulation of promotions posing a perceived threat of deceiving the audience. *See, e.g., Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (advertising prices of routine legal services); *In re R.M.J.,* 455 U.S. 191, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982) (advertising areas of practice of law); *Friedman v. Rogers,* 440 U.S. 1, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979) (prohibition of trade name use by optometrists). 2) In each of these cases,

the regulation either was sustained or upended in light of the nature of the speech itself and the harms regulation assertedly turned away. *Compare, e.g., Ohralik v. Ohio State Bar Ass'n,* 436 U.S. 447, 98 S.Ct. 1912, 56 L.Ed.2d 444 (1978) (in-person solicitation properly prohibited where consumer had no opportunity to reflect; potential for abuse great) *with Bates v. State Bar of Arizona,* 433 U.S. 350, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977) (truthful advertisements regarding routine legal services protected; not inherently misleading, and asserted adverse effects on professionalism insufficient to justify prohibition). 3) Disclaimers required of commercial advertisers have been given wider berth than outright prohibitions on speech. See *Virginia Pharmacy,* 425 U.S. at 771, n. 24, 96 S.Ct. at 1830 n. 24; *compare Zauderer v. Office of Disciplinary Counsel,* 105 S.Ct. at 2281–82 (disclosure requirement "trenched more narrowly" on commercial speech rights than flat ban) *with Central Hudson Gas & Elec. v. Public Serv. Comm'n,* 447 U.S. at 570–71, 100 S.Ct. at 2353–54 (selected disclosures required of utility would have been as effective, and less intrusive, than prohibiting the speech).

In its most recent pronouncement on the topic, the Court has demonstrated uncharacteristic restraint in comparison with past decisions. *Posadas de Puerto Rico Assocs. v. Tourism Co. of Puerto Rico,* — U.S. ——, 106 S.Ct. 2968, 92 L.Ed.2d 266 (1986). Puerto Rico prohibited its legalized casinos from promoting residential clientele through advertising. The proscription was a police power measure, to prevent excessive gambling among Puerto Ricans and its perceived effects. *Id.* 106 S.Ct. at 2977. Casinos were free to cater to tourists by any medium, so long as contact with residents was only "incidental." *Id.* 106 S.Ct. at 2974. Applying the *Central Hudson* test[6], the Court upheld the regulatory

---

**6.** The Court announced in *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n,* 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) a four-feature test to be applied in challenges to commercial speech regulation. At the outset,

the communication must be found protected, i.e., a) it must refer to a lawful activity, and b) it must neither be false nor misleading. When and if the speech in question so qualifies, the regulatory or prohibitory framework is scruti-

framework. Despite the lawfulness of the underlying activity and conceded absence of misrepresentation or fraud, the Court found a substantial interest directly advanced in a nonexcessive manner by the narrowly-construed provisions.

Although analytically deferential, *Posadas* is consistent with past cases in finding the ability to control commercial speech tied to the power to regulate the underlying activity:

> [T]he Puerto Rico Legislature surely could have prohibited casino gambling by the residents of Puerto Rico altogether. In our view, the greater power to prohibit necessarily includes the lesser power to ban advertising of casino gambling....

*Id.* 106 S.Ct. at 2979. Likewise, the Court observed in *Ohralik* that "the State does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. at 456, 98 S.Ct. at 1918; *see also Metromedia Inc. v. City of San Diego*, 453 U.S. 490, 507, 101 S.Ct. 2882, 2892, 69 L.Ed.2d 800 (1981) ("protection available for a particular commercial expression turns on the nature both of the expression and of the governmental interests served by its regulation"); *Bigelow v. Virginia*, 421 U.S. 809, 826, 95 S.Ct. 2222, 2234, 44 L.Ed.2d 600 (1975) (relationship of speech to a regulated activity one factor in balancing government and First Amendment interests).

Appellant repeatedly maintains that since his own isolated use of the word "pedodontist" in advertising is neither untruthful nor deceptive, the statutes *as applied to him* are unconstitutional. Unfortunately, this goes too far:

> We agree that the appropriate focus is on appellant's conduct. And, as appellant urges, we must undertake an inde-

pendent review of the record to determine whether that conduct was constitutionally protected.

\* \* \* \* \* \*

But appellant errs in assuming that the constitutional validity of the judgment below depends on proof that his conduct constituted actual overreaching or some specific injury....

*Ohralik v. Ohio State Bar*, 436 U.S. at 463–64, 98 S.Ct. at 1922. To hold otherwise, at least for purposes of this and similar cases, would be to negate the effect of all rules of general applicability, and subject every regulatory or statutory framework to an implicit amendment mandating case-by-case review. Moreover, as in *Ohralik*, the statute and regulation here are incipient; the legislature did not contemplate awaiting actual harm to develop, nor can appellant claim that they must.

No argument can be made that the practice of pedodontics is unlawful; likewise, no serious argument can be advanced that one *qualified* to advertise as such misleads or deceives the public. To this extent at least, respondent is correct in claiming this dispute concerns "the right of the State to safeguard the public health by establishing qualifications for dental specialty licensure." Br. of Respondent 19. It is the reasonableness of applying that authority in the manner chosen which remains to be addressed.

The State has a substantial and long-recognized interest in maintaining quality medical care for residents; this of necessity calls for some mechanism by which to police the ranks of health professionals to sustain a chosen level of competence among them. *See Missouri Dental Bd. v. Alexander*, 628 S.W.2d 646 (Mo. banc 1982); *see generally Ohralik v. Ohio State Bar Ass'n*, 436 U.S. at 460, 461, n. 17, 98 S.Ct. at 1921 n. 17 (citing *Virginia Phar-*

---

nized to discern whether c) the State's regulatory interests are directly advanced by the means chosen; d) the means applied are "no more extensive than necessary to serve" the interests asserted. *Id.* at 566, 100 S.Ct. at 2351. Technical application, however, should be

avoided; balancing state and first amendment interests is still central. *Friedman v. Rogers*, 440 U.S. at 20, 99 S.Ct. at 899 (Blackmun, J., dissenting); *see also Posadas*, 106 S.Ct. at 2981–82 (Brennan, J., dissenting).

*macy*, 425 U.S. at 766, 96 S.Ct. at 1828); *Bigelow v. Virginia*, 421 U.S. at 809, 95 S.Ct. at 2222; *id.* at 832, 95 S.Ct. at 2237 (Rehnquist, J., dissenting).

■ Given that some regulatory device is clearly justified by health, safety and welfare concerns, this particular framework must be inspected for "means to ends fit." *See Posadas*, 106 S.Ct. at 2977. There appears no significant problem in finding the ends are directly advanced by § 332.321.2(14); to protect the public from those unqualified to practice in a specialty field, the State must apply some apparatus to screen those who would promote their services as such despite their inabilities. The State's choice here was reasonable: it ensures that only qualified persons will promote themselves, and that the public will be apprised when a limited though unqualified practitioner who has no specialty license purports to bear such qualifications. *See generally Metromedia, Inc. v. City of San Diego*, 453 U.S. at 508–513, 101 S.Ct. at 2892–95; *compare Central Hudson*, 447 U.S. at 564–65, 100 S.Ct. at 2350. The remaining and most critical inquiry is whether this regulatory scheme acts as a bludgeon rather than scalpel, i.e., "whether the restrictions on commercial speech are ... more extensive than necessary to serve the government's interest." *Posadas*, 106 S.Ct. at 2978.

The disclaimer of § 332.321.2(14)(f) rather readily may be found constitutionally sufficient; appellant has only a minimal protected interest in *"not* providing ... particular factual information." *Zauderer v. Office of Disciplinary Counsel*, 105 S.Ct. at 2282. The interests of the State,

by requiring "factual and uncontroversial information" about the services involved, are advanced at no significant cost to the disclaimant's first amendment rights. *Id.* More important is the value to consumers of the greater information conveyed: Disclaimers are effective safeguards to dissipate "consumer confusion or deception." *In re R.M.J.*, 455 U.S. 191, 209, 102 S.Ct. 929, 71 L.Ed.2d 64 (1982). The disclaimer prescription advances the State's interest in a circumscribed manner, yet causes appellant no outweighing harm; it is on that basis upheld.[7]

More troubling is § 332.321.2(14)(e), which prohibits appellant and others similarly situated from advertising as specialists or limited practitioners unless that practitioner is licensed and certified by the State. The Supreme Court has in the past rejected like prohibitions on commercial speech, finding them "paternalistic": Consumers "will preserve their own best interests if only they are well enough informed, and ... the best means to that end is to open the channels of communication rather than to close them...." *Central Hudson*, 447 U.S. at 562, 100 S.Ct. at 2349 (citing *Virginia Pharmacy*, 425 U.S. at 770, 96 S.Ct. at 1829; *Linmark Assocs., Inc. v. Willingboro*, 431 U.S. at 92, 97 S.Ct. at 1618). Still, however, the State may "ban forms of communication *more likely to deceive the public than to inform it....*" *Central Hudson*, 447 U.S. at 563, 100 S.Ct. at 2350 (citing *Friedman v. Rogers*, 440 U.S. at 13, 15–16, 99 S.Ct. at 895, 896–97) (emphasis added). Critical to the permitted scope of regulation, then, may be the potential deception involved in the use of a word or phrase. *See Metromedia, Inc. v. City of*

---

7. Appellant relies on *Spencer v. Honorable Justices of Sup. Ct. of Pa.*, 579 F.Supp. 880 (E.D.Pa. 1984), *aff'd*, 760 F.2d 261 (3d Cir.1985), in which was struck down a disclaimer provision requiring attorneys to disclose they were neither certified nor recognized as specialists should they desire to advertise practice limitations. *Id.* at 891. No specialty or certification system had to that date been implemented in the state. *Id.* at n. 18. It is on this basis that the present appeal is distinguishable. The district court in *Spencer* found it would have been less restrictive, as well as sufficient to serve the state's interests, to

require a disclosure that no lawyers were certified to specialize in the state. Here, on the other hand, the specialist is a recognized individual, set apart by the legislature as someone unique. It is difficult to visualize a manner by which the fact of specialty could be disclaimed less intrusively than section 332.321.2(14)(f) directs. Moreover, to permit appellant to advertise as a specialist without complying with Missouri laws pertaining to certification would be to revoke the certification system altogether. This would relegate consumers to uninformed and harmful choices.

*San Diego*, 453 U.S. at 507, 101 S.Ct. at 2892 (protection available turned on nature of expression and interests served); *Friedman v. Rogers*, 440 U.S. at 11–13, 99 S.Ct. at 895 (analysis of inherent deception in use of trade marks by optometrists).

*Friedman* is consistent with these principles; the Court confronted in *Friedman* whether Texas could prohibit the use of trademarks by optometrists. The Court explained and distinguished *Bates* and *Virginia Pharmacy* as dependent on the potential for deceit and manipulation inherent in the expression reviewed:

> In those cases the State has proscribed advertising by pharmacists and lawyers that contained statements about the products or services offered and their prices. *These statements were self-contained and self-explanatory.*

*Friedman v. Rogers*, 440 U.S. at 12, 99 S.Ct. at 895 (emphasis added). By contrast, the Court found trademarks ill-defined and manipulable, nebulous terms which conveyed "no information ... until [they] acquire[d] meaning over a period of time" through association with price and quality. *Id.* at 12–13, 99 S.Ct. at 895. The prohibition was upheld, justified by the potential for deception present and the strength of the State's interests.

Similarly, "specialist" and like terms bear no reliable and intrinsic meaning; the content of a specialty is tied to the educational or other requirements which qualify a professional to hold himself out as one who specializes. Bereft of standard, the term still may project a high degree of profession on its face, but the underlying qualification is subject to the whims of the user. Thus, to permit this sort of information to "flow freely" would in essence keep consumers ignorant of crucial information which they must and ought to be able to rely on in choosing a dentist for their children. *Compare Virginia Pharmacy*, 425

U.S. at 748–49, 96 S.Ct. at 1817–19. The general public requires some uniform standard of minimal competence, and the ability to rely on *each and every* representation that a particular dentist in fact qualifies as a specialist in pedodontics.

Appellant does not suggest, however, that no standard should be applied; rather, he insists essentially on a system of case-by-case review to determine whether a particular dentist qualifies as a specialist. Weighing the interests involved, his contention cannot be sustained. The State's interests, as noted above, are strong. Parmley's First Amendment rights, on the other hand, are not burdened to such an extent as to outweigh these important interests. He is not prohibited absolutely from holding himself out as a dental practitioner limited to the treatment of children. He only must disclaim any licensure by the State as a pedodontist under § 332.321.-2(14)(f). Finally, common sense suggests that, given appellant's qualifications,[8] it should be no significant burden for him to comply with the licensing requirements of § 332.321. It seems the wiser course to enforce the rule in the interests of the State and its residents, rather than begin a course which only can lead to greater harm than benefit.

The requirements of § 332.321.2(14)(e) and (f), then, directly advance important state and public interests in a manner which does not trench significantly on appellant's first amendment rights, especially when these are balanced directly against the State and public interests cited.

The statute is sustained against appellant's First Amendment challenge.

■ Appellant next asserts that § 332.-321, § 332.171.1 and 4 CSR 110–2.110, as applied to him, deny him equal protection of law as guaranteed by the Fourteenth Amendment of the Constitution of the Unit-

---

**8.** "Plaintiff is a licensed dentist in the State of Missouri and has limited his practice to pedodontics ... for more than twenty years. He is a member of several professional associations within the specialty of pedodontics, has publish-

ed in the field, and is recognized as a practicing pedodontist by other dentists who refer him pedodontic cases, including members of the Missouri Dental Board itself." Br. of Appellant 18 (citations to record omitted).

ed States and art. I, § 2 of the Constitution of the State of Missouri. He argues that he is being treated differently from other dentists, pedodontists, specialists in other areas, and doctors.

The threshold determination in equal protection claims is to ascertain the proper standard of review. Recently, in *Belton v. Board of Police Commissioners,* 708 S.W.2d 131, 139 (Mo. banc 1986), it was stated that:

> In equal protection claims the first step is to ascertain whether the statutory scheme "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution.... *San Antonio Independent School District v. Rodriguez,* 411 U.S. 1, 17 [93 S.Ct. 1278, 1288, 36 L.Ed.2d 16] (1973)"; *State Board of Registration v. Giffen,* 651 S.W.2d 475, 479 (Mo. banc 1983). If so, the statutory scheme receives strict judicial scrutiny to ascertain whether the classification is necessary to a compelling state interest. *Id.* If the classification neither burdens a suspect class, nor impinges upon a fundamental right, the only issue is whether the classification is rationally related to a legitimate state interest. *Friedman v. Rogers,* 440 U.S. 1, 17, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979); *Giffen, supra,* 651 S.W.2d at 479. In such a situation the burden is on the person attacking the classification to show that it does not rest upon any reasonable basis, and is purely arbitrary. *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78–79, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911); *City of St. Louis v. Liberman,* 547 S.W.2d 452, 458 (Mo. banc 1977). Under this analysis a classification will be upheld if any state of facts can be reasonably conceived which would justify it. *McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961); *Liberman, supra,* 547 S.W.2d at 458.

See also, *Missouri Dental Board v. Alexander,* 628 S.W.2d 646, 649–51 (Mo. banc 1982).

In *State Bd. of Registration v. Giffen,* 651 S.W.2d 475 (Mo. banc 1983), we were confronted with an equal protection claim based on the fact that doctors of osteopathy were not allowed to use the "M.D." designation in any public announcements, while foreign medical graduates who also did not possess an M.D. degree could use the "M.D." designation. We reasoned as follows:

> No fundamental right is at stake here. The Supreme Court has expressly declined to decide whether doctors have a constitutional right to practice medicine, *Singleton v. Wulff,* 428 U.S. 106, 113, 96 S.Ct. 2868, 2873–74, 49 L.Ed.2d 826 (1976) (plurality), but it has said that in any event "there is no right to practice medicine which is not subordinate to the police power of the States," *Lambert v. Yellowley,* 272 U.S. 581, 597, 47 S.Ct. 210, 214, 71 L.Ed. 422 (1926). Similarly, this Court has said that "there can be no such thing as a vested right in the practice of medicine." *State v. Davis,* 194 Mo. 485, 501, 92 S.W. 484, 489 (1906). Any right there might be to practice medicine certainly does not fall within the high category of rights held to be fundamental, such as freedom of speech and freedom of the press, *Lovell v. Griffin,* 303 U.S. 444, 450, 58 S.Ct. 666, 668, 82 L.Ed.[2d] 949 (1983), freedom of religion, *Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 903, 84 L.Ed. 1213 (1940), the right to vote, *Reynolds v. Sims,* 377 U.S. 533, 561–62, 84 S.Ct. 1362, 1381–82, 12 L.Ed.2d 506 (1964), and the right to procreate, *Skinner v. Oklahoma,* 316 U.S. 535, 536, 62 S.Ct. 1110, 1111, 86 L.Ed. 1655 (1942). The practice of medicine therefore is not a fundamental right. Cf. *Younger v. Colorado State Board of Law Examiners,* 625 F.2d 372, 377 n. 3 (10th Cir.1980) (practice of law not a fundamental right). "A fortiori, the 'right' to use a particular professional designation is not a fundamental." *Maceluch v. Wysong,* 680 F.2d 1062, 1065 (5th Cir.1982).

*Id.* at 479–80.

Likewise, appellant's practice of dentistry cannot be said to be a fundamental

right, thus the "right" to announce his specialty in pedodontics is not fundamental. Neither can it be said that the classification draws upon some "inherently suspect distinctions such as race, religion or alienage." *New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 276 (1976); *Giffen, supra* at 480. Therefore, because the classification neither impinges on a fundamental right nor burdens a suspect class, the legislation need only be rationally related to a legitimate governmental interest.

Having already decided that appellant's First Amendment claim must fail, we need not further discuss whether appellant's equal protection claim withstands the applicable rational basis analysis. If under the *Central Hudson* test, the statutory restrictions are found to directly advance the governmental interest and go no further than necessary to do so, then they should survive a minimal level of scrutiny under traditional rational basis analysis. *Compare, Posadas de Puerto Rico Associates v. Tourism Co. of Puerto Rico,* — U.S. ——, 106 S.Ct. 2968, 2979 n. 9, 92 L.Ed.2d 266, 283 n. 9 (1986). Appellant's equal protection claim must therefore also fail.

Appellant's final point is that § 332.321 and 4 CSR 110–2.110 are unconstitutionally vague and indefinite under the Fourteenth Amendment to the Constitution of the United States and art. I, § 10 of the Constitution of the State of Missouri.

> Vagueness as a due process violation, takes two forms. One is the lack of notice given a potential offender because the statute is so unclear that "men of common intelligence must necessarily guess at its meaning." ... The second is that the vagueness doctrine assumes that guidance, through explicit standards, will be afforded to those who must apply the statute, avoiding possible arbitrary and discriminatory application.

*State v. Young*, 695 S.W.2d 882, 884 (Mo. banc 1985) [citations omitted]. *See also, State v. Brown*, 660 S.W.2d 694, 697 (Mo. banc 1983); *State ex rel. Williams v.*

*Marsh*, 626 S.W.2d 223, 233 (Mo. banc 1982).

Based on an obvious conflict between § 332.321.2(14)(f) and 4 CSR 110–2.110, appellant contends that both the statute and the regulation are vague in that it is impossible for a dentist to determine what conduct is allowed and what conduct is prohibited. Section 332.321.2(14)(e) prohibits the use of such a term as "specialist" without the dentist holding a valid Missouri specialty license. Subpart (f) of that same section allows a dentist to announce a limitation of practice if he uses a statutorily provided "Notice" that states that he is not licensed as a specialist. The regulation, which was promulgated in accordance with § 332.321, though, expressly prohibits the use of the phrase "Practice Limited to" without a specialty license. The conflict or inconsistency then is that the regulation attempts to preclude the use of an announcement that is otherwise allowed under subpart (f) of the statute.

■ The well-established rule is that regulations may be promulgated only to the extent of and within the delegated authority of the statute involved. *Bartlett and Co. Grain v. Director of Revenue*, 649 S.W.2d 220, 224 (Mo.1983); *State ex rel. River Corp. v. State Tax Commission*, 492 S.W.2d 821, 825 (Mo.1973), *overruled on other grounds, International Travel Advisors, Inc. v. State Tax Commission*, 567 S.W.2d 650 (Mo. banc 1978). When there is a direct conflict or inconsistency between a statute and a regulation, the statute which represents the true legislative intent must necessarily prevail. Therefore, to the extent that 4 CSR 110–2.110 forbids an announcement of limitation of practice even when the dentist gives notice that he is not licensed, it is a nullity.

■ However, the conflict between the statute and regulation does not support the proposition that both are unconstitutionally vague. The constitutional doctrine of vagueness and the rule regarding conflicts are two unrelated theories and do not go hand-in-hand. A regulation may directly contradict or be inconsistent with a statute,

but still prescribe the required conduct with sufficient certainty and definiteness to satisfy the vagueness doctrine for constitutional purposes.

In addition, it is not necessary to determine if a situation could be imagined in which the language used might be vague or confusing; the language is to be treated by applying it to the facts at hand. *Prokopf v. Whaley*, 592 S.W.2d 819, 824 (Mo. banc 1980). The appellant wished to make an *unqualified* announcement that he was limiting his practice to and specializing in pedodontics. Such an announcement is clearly prohibited both under the statute and the regulation. Thus it is difficult to see how appellant would be unable to discern that his proposed announcement is improper. Therefore, appellant's final point must fail.

The judgment is affirmed.

HIGGINS, C.J., and BILLINGS, WELLIVER and ROBERTSON, JJ., concur.

RENDLEN, J., concurs in result.

BLACKMAR, J., concurs in result in separate opinion filed.

BLACKMAR, Judge, concurring in result.

I concur in the result reached and in substantially everything that is said in the carefully analyzed principal opinion.

My reservations relate to the statutory reference to advertising of "practice limited to." The prohibition against saying, "practice limited to pedodontics" is appropriate to maintain the integrity of state certification of specialists in that explicit field. The required disclaimer is somewhat demeaning, and in this respect it stands in contrast to *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 105 S.Ct. 2265, 85 L.Ed.2d 652 (1985), in which the disclaimer simply required a statement that one who signed a contingent fee contract might nevertheless be liable for expenses and costs of an unsuccessful suit. The legislature could appropriately conclude, however, that if the plaintiff used the statutory term, some people might be led to believe that he had the credentials of a licensed certified pedodontist.

I am not so sure that the same considerations would apply to the use of the phrase, "practice limited to," if the field of limitation is not expressed in the precise terms employed for a statutorily recognized specialty. The statement of limitation is perfectly true and not misleading. The public may draw an inference of special competence on account of the limitation, but the inference is not an illegitimate one. *Cf. Zauderer*, 105 S.Ct. at 2276–77, as to the discussion of the lawyer's experience in certain types of litigation. The only justification for a restriction is to protect the public from confusion. Protection of the licensed specialist's turf is not a proper motive. The licensed specialist who fears the cheapening of his speciality may state in so many words that he is state licensed. There is an interesting discussion in *Durham v. Brock*, 498 F.Supp. 213, 223, n. 16 (M.D.Tenn.1980).

As *Zauderer* points out, the "least restrictive" test of *Central Hudson Gas & Electric Corporation v. Public Service Commission of New York*, 447 U.S. 557, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) does not apply to properly required disclaimers. But disclaimers of the kind here involved have potential for harm and should be subject to a degree of judicial scrutiny.